IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| JOHN MCGILL,<br>Movant, | : <br> : <br> : | MOTION TO VACATE<br>28 U.S.C. § 2255 |
| v. | : <br> : <br> : | CRIMINAL ACTION NO.<br>1:14-CR-167-WSD-LTW |
| UNITED STATES OF AMERICA,<br>Respondent. | : <br> : | CIVIL ACTION NO.<br>1:17-CV-805-WSD-LTW |

## ORDER AND FINAL REPORT AND RECOMMENDATION

Movant is a federal prisoner who, pro se, challenges under 28 U.S.C. § 2255 his judgment of conviction. (Doc. 67.)[1] Respondent filed a brief opposing the motion, (doc. 79), and Movant filed a reply, (doc. 88). Movant also filed a petition to supplement his § 2255 motion with records he received regarding one of his claims. (Doc. 69.) The undersigned grants the petition to supplement and, for the reasons discussed below, recommends that the § 2255 motion and a certificate of appealability be denied.

---

[1] All citations to the record are to case number 1:14-cr-167-WSD-LTW. The Court cites the page numbers created by the Court's electronic docketing system for all documents except those admitted as exhibits at trial because those exhibits are not on the electronic docket. (*See* Docs. 43, 43-1.) Only two trial exhibits cited here - Respondent's exhibits three and four – have multiple pages, and the Court cites the page numbers marked on those exhibits.

## I.    Background

This care arose from a sting operation conducted in the Northern District of Georgia by a task force consisting of local and federal law enforcement.  The task force was the Metro Atlanta Child Exploitation Task Force, and the sting was Operation Broken Heart.  (Doc. 60 at 78-79.)  Laurie Nicholson, a detective with the Alpharetta Police Department, was part of the task force and was the case agent.  (*Id.*)

On the evening of February 28, 2014, Nicholson posted an advertisement ("ad") on the "casual encounters" section of Craig's List's Atlanta internet website.  (*Id.* at 79-80, 83; Gov't Trial Ex. 1.)  The title of the ad was "last chance - w4m - 35 (Lithonia)."  (Gov't Trial Ex. 1.)  The term "w4m" refers to "[w]omen seeking men." (Doc. 60 at 114.)  The ad read:

> I am new to craigslist but I have tired [sic] everything else, I have seen other ads here and well why not ....

> I am a mom with young teen daughter who needs some fatherly attention.

> What I need from you... descreet [sic], clean both drugs and disease free. I have an open mind and need you to too. I don't send pics of us until after I know you - she is my world and I am not going to lose that. I don't need your drama just your willingness to be the best daddy to her possible.

2

(Gov't Trial Ex. 1.)  In the undercover operation, Nicholson posed as a woman named Amy Walker, and her fictitious daughter's name was Emily.  (Doc. 60 at 82.)

On the morning of March 1, 2014, Movant responded to the ad via electronic mail ("email").  (*Id.* at 84-86; Gov't Trial Ex. 2.)  Movant asked: "What are you looking for. I'm an open minded guy? How might I help?"  (Gov't Trial Ex. 2.) Movant also provided his email address and asked Nicholson to respond to that address.  (*Id.*; Doc. 60 at 86.)

On the evening of March 1, 2014, Nicholson responded to the email address Movant provided.  (Doc. 60 at 86; Gov't Trial Ex. 3 at 1.)  Nicholson's email showed her name as "Amy Walker" and her email address as "emilysmomga@gmail.com." (Doc. 60 at 82; Gov't Trial Ex. 3 at 1.)  Nicholson's first email to Movant read, in its entirety: "Looking for someone to teach my daughter how to be with a man."  (Doc. 60 at 86; Gov't Trial Ex. 3 at 1.)

Seven minutes later, Movant replied by email that he "could help if you want me to," asked Nicholson where she lived, and said he looked forward to hearing back from her.  (Doc. 60 at 86-87; Gov't Trial Ex. 3 at 1.)  Movant also offered to call Nicholson if she preferred that to email.  (*Id.*)

3

Nicholson's next email asked Movant "have you taught anyone before" and for his physical description. (Gov't Trial Ex. 3 at 1.) Movant replied with the description and said:

> I'd like to know more about the approach to this. Would we do a lot of talking and explaining as we go? Would you and I demonstrate together and she would actively participate? I would like to hear more of your expectations. I would also like to know a description of the both of you. Will you tell me her age?

(*Id.*) Movant also asked if Douglasville, where he lived, was "very far from where you live." (*Id.*) Movant said he would be happy to call Nicholson, that he wanted to help if he could, and that it was nice talking with her. (*Id.*)

Nicholson responded with Emily's height and weight – approximately five feet one inch tall and 100 pounds – and offered to send a picture of herself and Emily with Emily's face obscured. (Doc. 60 at 88; Gov't Trial Ex. 3 at 2.) Nicholson then said, in response to Movant's questions: "This would be just her I am more for security she is 13." (*Id.*) That age, 13, is consistent with the statement in Nicholson's Craig's List ad that described her daughter as a "young teen." (Gov't Trial Ex. 1.)

Five minutes later, Movant responded "ok. that will be fine to send a pic. how does she feel about all this?" (Gov't Trial Ex. 3 at 2.) Nicholson then sent Movant a picture of herself standing next to a short person whose face was obscured. (*Id.*)

4

Over the next hour, Movant and Nicholson exchanged a few more short emails about their background before deciding to switch to text messaging. (Doc. 60 at 89-90; Gov't Trial Ex. 3 at 2-3.) Movant and Nicholson began text messaging, using their smart phones, at 10:48 p.m. on March 1, 2014. (Doc. 60 at 91-92; Gov't Trial Ex. 4 at 1.) Their communications over the next three hours consisted of almost two hundred text messages, with over half of those sent by Movant. (Gov't Trial Ex. 4.)

In his third text message to Nicholson, Movant said he wanted to talk more about her plan and asked her "[w]hat would you like to happen." (*Id.* at 1.) Nicholson responded that "she is a virgin," referring to her daughter, and said she did not really have a plan. (*Id.*) When Movant asked if Nicholson wanted him to come to her house and she said yes, he said that was fine. (*Id.*)

Nicholson then asked when Movant would "be available for something?" (*Id.*) Movant's response was "I think sex should also be about trust and respect" and "I would want her to be as comfortable and relaxed as possible." (*Id.*) That was the first explicit mention of sex in the communications between Movant and Nicholson. Movant then asked "[i]s she ready" and whether Nicholson had "pretty deep talks about foreplay etc" with her daughter." (*Id.*)

5

A few minutes after raising the topics of "sex" and "foreplay," Movant was first to mention a specific act: "Would it freak her out to kiss her?" (*Id.* at 2.) When Nicholson replied that she did not think so, Movant asked if "she had any experiences at all?" (*Id.*) Nicholson replied "none just sex ed at school." (*Id.*) Movant replied: "Ok. I'm not trying to bug ya. Just want to know as much as I can[.] And you would be with us the entire time?" (*Id.*) Nicholson said she would be there, "at least at first," to which Movant replied, "Ok[.] And that's fine." (*Id.*)

Movant asked Nicholson if "we would share details of plans with her so she would know what to expect." (*Id.*) Movant and Nicholson then discussed their locations, and Movant asked "[w]as she hoping for tonight?" (*Id.* at 3.)

Movant then said he had more questions. (*Id.*) His first was: "Well I would tell her how pretty she is[.] What would she be wearing?" (*Id.*) When Nicholson asked what Movant wanted her daughter to wear, Movant replied that "[s]he should wear sexy panties" and that he "would want to kiss her and hope that she got into it and that would certainly make things move along much better." (*Id.* at 4.) Movant said "[w]e could go as far as she wants" and that he "would want her to understand what turns a guy on and what to do about that." (*Id.*)

6

Movant then said he "would like to undress her if she were comfortable with that . . . would kiss and rub her body as I undressed her . . . [and] would ask her if I could kiss her on top of her bra and panties to start with." (*Id.* at 4-5.) "I don't know if she will like oral sex or not," Movant continued, "I would tell her how much I like doing that[.] I just wanted to make sure it would be ok with you if I went down on her?" (*Id.* at 5.)

Movant told Nicholson he was fifty minutes from Lithonia and asked what she thought about him coming to her house. (*Id.*) Nicholson replied that she "can put her in a shower and she can be fresh for you." (*Id.*) Movant replied "Ok. Sounds great" and asked "[d]o you have any lube." (*Id.* at 5-6.) Movant then told Nicholson to "[t]ell her that when she showers to shower everywhere because we may go there." (*Id.* at 6.)

Movant drove to a Chevron gas station less than a mile from the house where Nicholson and other law enforcement agents were waiting and sent Nicholson a message that he was there. (*Id.*; Doc. 60 at 101-02.) Agents watching the gas station saw Movant arrive at approximately 1:30 a.m. on March 2, 2014. (Doc. 60 at 102-04.) Nicholson then gave Movant the address for the house. (*Id.*; Gov't Trial Ex. 4 at 7.)

Movant drove to the house and was arrested when he approached the front door.

7

(Doc. 60 at 131.)   Chris Pasibe, a detective with the DeKalb County District Attorney's office, arrested Movant and searched his person.  (*Id.*)  The only items on Movant's person at the time of his arrest were his keys and an unopened condom.  (*Id.* at 132.)  Georgia Bureau of Investigation ("GBI") Special Agent Brook Lindsey photographed and inventoried those items, as well as Movant's truck and his smart phone and tablet computer that were in the truck.  (*Id.* at 138-44; Gov't Trial Exs. 5-6, 8-11.)

On May 6, 2014, a grand jury indicted Movant for attempting to persuade, induce, or entice a person under the age of eighteen years to engage in sexual activity that would be a crime under state law, in violation of 18 U.S.C. § 2422(b).  (Doc. 1.) Movant filed a motion to dismiss the indictment, which the Court denied because the indictment was proper on its face and the motion improperly argued that there was insufficient evidence that Movant violated § 2422(b).  (Doc. 17.)

Movant then retained attorney Eric Crawford as his new counsel.  (Doc. 19.) Three months later, a jury trial was conducted, at which Respondent presented all of the evidence discussed above.  (Docs. 60, 61.)  Nicholson, Pasibe, and Lindsey testified for Respondent.

8

Respondent's last witness at trial was Raymond Drew, an officer with the Cobb County Police Department's Special Victims Unit. (Doc. 60 at 149-50.) Drew interviewed Movant at the house where he was arrested for approximately ninety minutes immediately following the arrest. (*Id.* at 150-52.) The interview was recorded by video and audio equipment, and a portion of the video recording was played at trial. (*Id.* at 159-60; Doc. 61 at 5-17; Def. Trial Ex. 2.)

Movant also testified at trial. (Doc. 61 at 21-46.) Movant's defense was, and remains today, that he was only seeking an extramarital affair with an adult female and never intended to have sex with a child. (*See id.*) The only evidence Movant presented at trial other than his testimony was the video recording of a portion of his interview with Drew. (Def. Trial Ex. 2.)

Crawford attempted to admit into evidence a copy of the Operational and Investigative Standards for the Internet Crimes Against Children program, which applied to the law enforcement task force (the "ICAC Standards"). Crawford first presented the ICAC Standards to Nicholson, who told him that she did not recognize the document. (Doc. 60 at 124.) Nicholson testified that she had been trained on the ICAC Standards, but had never received a copy of them. (*Id.* at 124-25.) Because

9

Nicholson did not recognize the ICAC Standards Crawford showed her, and thus could not authenticate them, Crawford did not move for their admission at that time.

Crawford later asked Pasibe if he was familiar with the ICAC Standards. (*Id.* at 134.) Pasibe said he was familiar with them, but could not recall their content because it had been a while since his training. (*Id.*)

Crawford next showed the ICAC Standards to Lindsey. (*Id.* at 145.) When asked if the document was a fair and accurate representation of the rules applicable to a case like this, Lindsey replied "I guess so." (*Id.* at 145-46.) Crawford then moved for admission of the ICAC Standards, but the Court said that Lindsey's response did not meet the legal standard for authentication of the document. (*Id.* at 146.) Upon further questioning and her review of the document, Lindsey testified that she did not remember the content of the ICAC Standards that she had previously reviewed and could not say whether the trial document was the same as the ICAC Standards she had reviewed. (*Id.* at 146-47.) Lindsey, like Nicholson and Pasibe, thus could not authenticate the document, and it was not admitted into evidence.

The jury convicted Movant. (Doc. 45.) Two months later, the Court sentenced Movant to ten years' imprisonment, which was the statutory minimum sentence, and supervised release for life. (Doc. 51.)

10

Movant filed a notice of appeal and retained attorney Marcia Shein to represent him on appeal. (Docs. 52, 56.) Movant asserted three claims: (1) the Court erred in denying the motion to dismiss the indictment; (2) the Court erred in denying admission of the ICAC Standards at trial; and (3) the trial evidence was insufficient to support a conviction under 18 U.S.C. § 2422(b). (Doc. 65.) The Court of Appeals rejected those claims and affirmed the judgment of conviction. (*Id.*)

Movant raised several claims in his § 2255 motion. (Doc. 67-1.) Movant discussed many claims multiple times, as he asserted that some claims violated multiple constitutional rights. (*Id.*) The Court organizes the claims as follows, with citations to the motion:

1.   Operation Broken Heart and the ensuing prosecution were unlawful because the Posse Comitatus Act was violated, there were problems with the task force coordinators, there was selective prosecution, the GBI publicized information that precluded an impartial jury, and the prosecution violated Movant's right to free speech (Doc. 67-1 at 47-54, 82-84, 88, 90-92);

2.   the grand jury proceedings were unlawful (*id.* at 32-47);

3.   exculpatory evidence was not disclosed by Respondent or presented at trial (*id.* at 7-11, 13-22, 60-61, 89-93, 99);

4.   the ICAC Standards were improperly excluded at trial (*id.* at 22-32, 62-69, 84-87, 99-101);

11

5.     Respondent's counsel presented perjured testimony at trial, made improper remarks to the jury, and engaged in outrageous misconduct (*id.* at 54-60, 69-73, 97-98);

6.     Respondent entrapped Movant into committing the crime (*id.* at 73-82, 93-96);

7.     the Court improperly sentenced Movant to supervised release for life (*id.* at 104-06); and

8.     Crawford rendered ineffective assistance before and during trial (*id.* at 3-16, 70-71, 84-85, 88-89, 102-04).

Respondent contends that all those claims, except the last one, are procedurally defaulted because Movant did not raise them on direct appeal or because they were adjudicated on appeal. (Doc. 79.) Respondent further contends that the defaulted claims lack merit and that Crawford did not render ineffective assistance. (*Id.*)

## II.    Legal Standards For Relief Under 28 U.S.C. § Section 2255

To prevail on a § 2255 motion, the movant must demonstrate that: (1) the sentence was imposed in violation of the Constitution or laws of the United States; (2) the Court was without jurisdiction to impose such a sentence; (3) the sentence exceeded the maximum sentence authorized by law; or (4) the sentence is otherwise subject to collateral attack. 28 U.S.C. § 2255. A sentence is subject to collateral attack when there is a fundamental defect that results in a complete miscarriage of

12

justice. *United States v. Addonizio*, 442 U.S. 178, 185 (1979). "To obtain collateral relief, a [movant] must clear a significantly higher hurdle than would exist on direct appeal." *United States v. Frady*, 456 U.S. 152, 166 (1982).

"Generally, if a challenge to a conviction or sentence is not made on direct appeal, it will be procedurally barred in a [] § 2255 challenge" unless the movant shows "both cause for his default as well as demonstrating actual prejudice suffered as a result of the alleged error." *Black v. United States*, 373 F.3d 1140, 1142 (11th Cir. 2004). "[T]o show cause for procedural default, [a § 2255 movant] must show that some objective factor external to the defense prevented [him] . . . from raising his claims on direct appeal and that this factor cannot be fairly [attributed] to [his] own conduct." *Lynn v. United States*, 365 F.3d 1225, 1235 (11th Cir. 2004). "Actual prejudice" requires a movant to show that the alleged error "worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Reece v. United States*, 119 F.3d 1462, 1467 (11th Cir. 1997). Ineffective assistance of counsel may constitute cause for a procedural default, but "[n]ot just any deficiency in counsel's performance will do[.] . . . [T]he assistance must have been so ineffective as to violate the Federal Constitution." *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000).

13

To establish ineffective assistance of counsel, a § 2255 movant must show that his counsel's performance was deficient such that it was below objectively reasonable standards, and that the deficient performance prejudiced the movant. *Strickland v. Washington*, 466 U.S. 668, 688, 692 (1984). As for the first prong of the test, a court should be "highly deferential" in scrutinizing counsel's performance, *id.* at 689, and "must indulge the strong presumption that counsel's performance was reasonable and that counsel made all significant decisions in the exercise of reasonable professional judgment," *Chandler v. United States*, 218 F.3d 1305, 1314 (11th Cir. 2000). To establish deficient performance, a movant must establish that no objectively competent lawyer would have taken the action that his lawyer took or would have failed to take the action he contends the lawyer should have taken. *Id.* at 1315.

Under the second prong of the test, a court determines whether counsel's challenged acts or omissions prejudiced the movant, i.e., whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* A court need not address both prongs of *Strickland*'s test if the movant "makes an insufficient showing on one." *Id.* at 697.

14

### III.   Analysis

Most of Movant's claims are procedurally defaulted because he did not raise them before his judgment of conviction was entered or on direct appeal. The Court cannot now consider the merits of those substantive claims unless Movant shows cause and prejudice for not raising them earlier, i.e., that the claims were not raised because of ineffective assistance of counsel. *See supra* Part II. In other words, Movant must show that Crawford rendered ineffective assistance by not raising the claims in this Court.[2]

Movant did raise on appeal his claim that the Court improperly excluded the ICAC Standards and a claim that the trial evidence was insufficient to support his conviction. *Supra* Part I. But the court of appeals rejected those claims on their merits. (Doc. 65.) "[O]nce a matter has been decided adversely to a defendant on direct appeal it cannot be relitigated in a collateral attack under section 2255." *United States v. Nyhuis*, 211 F.3d 1340, 1343 (11th Cir. 2000) (quotation marks omitted). That is true even if the claim is recharacterized or presented under a different legal theory in § 2255 proceedings. *Id.*

------

[2] Movant does not contend that Shein rendered ineffective assistance on appeal. All of his claims of ineffective assistance of counsel target Crawford. (Doc. 67-1 at 3-16, 70-71, 84-85, 88-89, 102-04; *see* Doc. 88.)

15

Movant has fairly alleged that Crawford rendered ineffective assistance in connection with all of Movant's substantive claims. The Court discusses below each claim and whether Movant has shown that Crawford rendered ineffective assistance. The Court last discusses the other alleged instances of Crawford's ineffectiveness.

A.   Claims Challenging Operation Broken Heart And The Prosecution

Movant challenges the sting operation in several respects, based largely on information he obtained after he was imprisoned.  First, Movant contends that Respondent violated the Posse Comitatus Act because U.S. Air Force Special Agent Maynard Depew was part of the arrest team for the operation.  (Doc. 67-1 at 90-92, 184; Doc. 69.)  Movant contends that Crawford (and, presumably, Movant's first lawyer who preceded Crawford) was ineffective for not investigating the "membership makeup and participation" of the task force to learn about Depew.  (Doc. 67-1 at 8, 10.)

Nothing in the record suggests that counsel should have suspected that a member of the U.S. military was involved in the sting operation or was part of the large task force that conducted it.  Movant has not identified any reason why any competent counsel would have searched for such an unusual thing in this case.

16

There is no evidence – including in the evidence presented at trial – that Depew had anything to do with the investigation or arrest of Movant. The task force's contact with Movant lasted less than twenty-four hours. The evidence showed that Nicholson was the only task force member who communicated with Movant prior to his arrest, Pasibe was the only member who arrested and searched Movant, and Drew and a female agent were the only members who interviewed Movant after his arrest. The complete lack of evidence that Depew was involved in any way in Movant's case further demonstrates that counsel was not deficient in not investigating the task force members or learning that Depew was a task force member.[3]

Second, Movant complains that Respondent failed to disclose problems with the task force coordinator. (*Id.* at 83-84, 88.) Movant obtained a newspaper article dated March 26, 2013, which reported that the U.S. Department of Justice investigated task force coordinator Ken Hillman for allowing civilians to participate in undercover stings. (*Id.* at 191-93.) That was one year before Movant was arrested, and there is

---

[3] Moreover, Movant has not cited any law suggesting that the mere violation of the Posse Comitatus Act, which is a criminal law targeted at those who misuse the military for civilian purposes, is grounds for avoiding a criminal prosecution or setting aside a judgment of conviction. *See* 18 U.S.C. § 1385; *Gonzales v. Bravo*, 561 F. App'x 673, 676 (10th Cir. 2014) (holding that claim that posse comitatus act was violated in sting operation leading to prosecution and conviction was "not cognizable" in habeas corpus action).

17

no evidence that civilians participated in Movant's case. There is no basis to find that Crawford was constitutionally deficient for not learning about Hillman.

Movant also learned that Cynthia Fuller, who presumably was Task Force Coordinator when Movant was arrested, did not have any background in law enforcement when she became coordinator. (*Id.* at 84.) Again, such information does not provide any basis to find Crawford deficient. Movant has not shown that any problems with Hillman or Fuller impacted his case in any way, much less shown a reasonable probability that the result of his case would have been different had Crawford discovered the purported problems.

Third, Movant complains that not all of the fourteen people arrested in Operation Broken Heart were federally prosecuted or punished as severely as him. (*Id.* at 47-53.) Movant obtained information showing that two Asian men and four black men were not prosecuted federally. (*Id.* at 49-50, 183.) Four of those men were convicted in state court, with two, like Movant, receiving a ten-year prison sentence. (*Id.*) Movant says the only other person prosecuted federally was John Benjamin Katz, a white male. (*Id.*) Katz pled guilty, and the Court sentenced him to ten years' imprisonment too. J., *United States v. Katz*, No. 1:14-cr-431-AT-JKL (N.D. Ga. Jan. 18, 2017).

18

"A selective-prosecution claim is not a defense on the merits to the criminal charge itself, but an independent assertion that the prosecutor has brought the charge for reasons forbidden by the Constitution." *United States v. Armstrong*, 517 U.S. 456, 463 (1996). The U.S. Supreme Court's decisions "delineating the necessary elements to prove a claim of selective prosecution have taken great pains to explain that the standard is a demanding one." *Id.* A defendant must show by "clear evidence" that the decision to prosecute was based on a constitutionally protected characteristic, such as race or religion. *Id.* at 464-65 (quotation marks omitted).

The information Movant provided about the arrest and prosecution of fourteen people as part of Operation Broken Heart is not evidence, much less clear evidence, that Respondent prosecuted Movant because of his race or any other constitutionally protected characteristic. Respondent prosecuted another white male in this Court who received the same sentence as Movant (even though that person accepted responsibility and did not stand trial). There is absolutely no evidence that Respondent's decision to allow state authorities to prosecute the other people was motivated by any constitutionally protected characteristic. Movant's selective prosecution claim is grounded in speculation and conjecture. There is no basis to find

19

that Crawford was constitutionally deficient for not investigating what happened to the other people arrested as part of the sting or asserting a selective prosecution claim.

Fourth, Movant contends that the GBI's media release shortly after the arrests prevented an impartial jury. (Doc. 67-1 at 53-54.) This claim too lacks support, and the record refutes it. All potential jurors in this case completed a written questionnaire before trial. (Doc. 60 at 3.) The Court conducted a thorough voir dire of potential jurors before trial, including follow up on responses provided in the questionnaires. (*Id.* at 3-40.) That process ensured that no one chosen for the jury was biased, or could not be impartial, because of media coverage of the sting operation. Crawford actively participated in the process of culling potentially partial jurors.

Movant's final claim here is that his prosecution and conviction violated his constitutional right to free speech. (Doc. 67-1 at 82-83.) But Movant did not provide any argument supporting that conclusory assertion; he simply quoted language from two court opinions about the First Amendment. (*Id.*) Movant's vague and conclusory claim does not show that his prosecution or conviction, or the criminal statute at issue in this case, violated his right to free speech, much less that Crawford was deficient for not raising such a claim.

20

Movant's challenges to the sting operation, task force, and other events leading to his prosecution are nothing more than desperate attempts to poke immaterial holes in the periphery of this case.  None of those challenges have merit.  Movant has not shown that Crawford rendered ineffective assistance in not raising those claims or investigating the underlying issues.  *See Owen v. Sec'y for Dep't of Corr.*, 568 F.3d 894, 915 (11th Cir. 2009) (holding that because claims lacked merit, "any deficiencies of counsel in failing to raise or adequately pursue them cannot constitute ineffective assistance of counsel").

B.     Claims Challenging The Grand Jury Proceedings

After he was imprisoned, Movant obtained a copy of the transcript of the testimony presented to the grand jury in this case. (Doc. 67-1 at 153-75.) Nicholson was the only person who testified before the grand jury.  (*Id.*)

Movant attacks Nicholson's testimony before the grand jury as consisting of speculation, conclusions, wrongful characterizations, and false statements. (*Id.* at 35-39.) Movant also attacks the prosecutor's failure to present to the grand jury evidence negating his guilt, an expert witness on crimes involving children, a witness knowledgeable of the ICAC Standards, and the actual emails and text messages that Movant exchanged with Nicholson. (*Id.* at 32-34, 39-42.)  Movant further contends

21

that the grand jurors' potential bias or prior knowledge of the case, based on media reports, was not probed because the transcript does not reflect that. (*Id.* at 8, 11.) Finally, Movant characterizes a statement Nicholson made in her grand jury testimony as "BOMBSHELL REMARKS" that show "a textbook example of entrapment."[4] (*Id.* at 45-46.)

"The grand jury proceeding is accorded a presumption of regularity, which generally may be dispelled only upon particularized proof of irregularities in the grand jury process." *United States v. Mechanik*, 475 U.S. 66, 75 (1986); *see also Hamling v. United States*, 418 U.S. 87, 139 n. 23 (1974). The presentation of hearsay or conclusory testimony is not an irregularity. *United States v. Waldon*, 363 F.3d 1103, 1109 (11th Cir. 2004).

The government's failure to present to a grand jury evidence negating the defendant's guilt "is simply not a legal error" because "[t]he government is under no

_____

[4] This last claim, like many of Movant's claims in his § 2255 motion, is based on hyperbole and exaggeration. The alleged "BOMBSHELL REMARK[]" is that Nicholson told the grand jury that another person (not Movant) who responded to the Craig's List ad immediately stopped communicating when he learned that Nicholson "wanted to have somebody have sex with her" daughter. (Doc. 67-1 at 45.) That statement, alone, could not prove entrapment as to any one. It certainly could not prove that Movant was entrapped because Nicholson never expressly told him she wanted him to have sex with the fictitious girl. It was Movant who first mentioned sex, and specific sex acts, in his communications with Nicholson. *See infra* Part III.F.

duty to bring exculpatory evidence to the grand jury's attention." *Id.* Movant's claim to the contrary "has been flatly rejected by the Supreme Court." *See id.*; *United States v. Williams*, 504 U.S. 36, 51-55 (1992). Thus, any failure to ensure the grand jury has not been exposed to publicity about the case is not error because "publicity is generally not a basis for dismissal of an indictment" and "the concern over adverse publicity is its effect on the fairness of the ensuing *trial*, and not its effect on the grand jury." *Waldon*, 363 F.3d at 1109; *see United States v. York*, 428 F.3d 1325, 1331-33 (11th Cir. 2005) (observing that, "in *Waldon*, we expressly assumed a high level of pre-trial publicity"). In short,

> the grand jury is not impeded by the evidentiary and procedural restrictions applicable to trial juries. A grand jury investigation may be triggered by tips, rumors, evidence proffered by the prosecutor, or the personal knowledge of the grand jurors. Moreover, [t]he grand jury's sources of information are widely drawn, and the validity of an indictment is not affected by the character of the evidence considered.

*York*, 428 F.3d at 1332 (citations and quotation marks omitted).

That law defeats Movant's challenges to the grand jury proceedings in this case. Given that law, Movant cannot show that Crawford was ineffective for not investigating the grand jury proceedings or raising the challenges to those proceedings that Movant raises in his § 2255 motion. Movant has not shown that Crawford had

23

any basis to believe there were irregularities in the grand jury proceedings or that, even if Crawford could have discovered a problem, there is a reasonable probability that the outcome of this case would have been different.

C.   Claims Regarding Exculpatory Evidence

Movant contends that Respondent did not disclose to the defense exculpatory evidence and that Crawford was ineffective for not discovering such evidence or presenting it at trial. (Doc. 67-1 at 7-11, 13-22, 60-61, 89-93.) Movant identifies that evidence as: (1) "numerous similar emails" Movant sent to adult women on or before March 1, 2014, (the date he initiated contact with Nicholson) in response to those women's Craig's List ads looking for casual encounters with men; (2) the results of law enforcement's search of the computer and six portable data storage (or "thumb") drives that Movant used at work, which did not reveal any incriminating evidence; (3) the forensic reports of law enforcement's search of Movant's home computer, tablet computer, and smart phone, which did not reveal any incriminating evidence other than the email and text communications with Nicholson; and (4) a letter from Movant's step-daughter "and other letters of support" or testimony regarding Movant's "good character." (*Id.* at 6-9, 11, 13-22, 61.)

24

Movant did not identify any of the alleged similar emails he sent in response to other Craig's List ads, the alleged letters of support, or any persons who would have testified at trial as to Movant's good character. Nor did he contend that he identified any of those items to Crawford. His vague claims regarding such unidentified evidence cannot establish ineffective assistance of counsel. *See Tejada v. Dugger*, 941 F.2d 1551, 1559 (11th Cir. 1991) (holding that a habeas petitioner cannot satisfy his burden of demonstrating ineffective assistance of counsel with "unsupported allegations, conclusory in nature and lacking factual substantiation.").

Crawford was not deficient for not obtaining or presenting Movant's communications regarding other Craig's List ads. Such evidence would not undermine the damning evidence of what Movant said and did in response to Nicholson's ad. In fact, Crawford could have reasonably concluded that such evidence would actually be detrimental to Movant. The jury would have learned from such evidence that while Movant responded to numerous ads not mentioning children, he acted on (by traveling to the person's home after discussing having sex with the person's child) only the ad seeking a man to interact with a child. Such evidence would have supported the jury's conclusion that Movant wanted to entice or persuade a child to have sex with him.

25

Nor was Crawford deficient for not obtaining the results of Respondent's searches of all the electronic devices or objecting to Respondent's failure to disclose those results.   At trial, Crawford elicited from Respondent's witnesses that the searches of Movant's smart phone and tablet computer did not reveal child pornography or other criminal activity and that Movant freely provided his password to those devices knowing that they would be searched for incriminating evidence. (Doc. 60 at 126-27, 162.)  The only incriminating evidence from electronic devices presented at trial was Movant's communications with Nicholson.  Crawford was not deficient, and there is not a reasonable probability that the jury would have acquitted Movant if it had written forensic reports of the lack of other incriminating evidence on the electronic devices Movant used.

To prevail on a *Brady* claim, Crawford would have had to show: (1) Respondent suppressed evidence either wilfully or inadvertently; (2) the evidence is favorable to Movant because it is exculpatory or impeaching; and (3) the evidence was material, i.e., suppression of the evidence prejudiced Movant. *See Banks v. Dretke*, 540 U.S. 668, 691 (2004); *Brady v. Maryland*, 373 U.S. 83, 87 (1963).  Favorable evidence is material when it "could reasonably be taken to put the whole case in such a different

26

light as to undermine confidence in the verdict," i.e., the defendant "must show a reasonable probability of a different result." *Banks*, 549 U.S. at 698-99.

There was no colorable *Brady* claim regarding the results of Respondent's searches of Movant's electronic devices.   The mere absence of additional incriminating evidence is not exculpatory evidence, especially where, as here, the government did not allege any criminal activity other than the single charged offense. "A defendant may not seek to establish his innocence . . . through proof of the absence of criminal acts on specific occasions." *United States v. Scarpa*, 897 F.2d 63, 70 (2d Cir. 1990) (rejecting claim that government had to produce audio tapes where defendant claimed "that the absence of incriminating statements on the tapes is relevant in the sense that it tends to disprove the government's theory").

> The fact that Government statements or exhibits are silent and do not implicate a defendant certainly cannot be construed as "favorable" to that defendant. In short, the absence of incriminating information in a report cannot be turned into an affirmative conclusion that it is "favorable" to the Defendants and, therefore, cannot constitute *Brady* material.

*United States v. Borda*, 941 F. Supp. 2d 16, 24 (D.D.C. 2013); *see United States v. Ellisor*, 522 F.3d 1255, 1270 (11th Cir. 2008) ("The fact that Ellisor purportedly produced other shows does not bear on his intent to defraud with respect to the Christmas show, and is therefore irrelevant."); *United States v. Williams*, 205 F.3d 23,

27

34 (2d Cir. 2000) (rejecting claim "that the district court improperly excluded . . . evidence that during two [prior] trips to Jamaica . . . [defendant] had apparently not engaged in drug activity"); *United States v. Marrero*, 904 F.2d 251, 260 (5th Cir. 1990) ("The fact that Marrero did not overcharge in every instance in which she had an opportunity to do so is not relevant to whether she, in fact, overcharged as alleged in the indictment.").

And the absence from trial of reports saying there was not additional incriminating evidence on the devices was not material to the outcome of the case. The evidence of Movant's communications with Nicholson and the actions he took immediately following those communications was clear and damning.  There is not a reasonable probability that presentation of forensic reports corroborating Nicholson's testimony that no other incriminating evidence was found would have put the whole case in such a different light as to undermine the jury's verdict.  *See Strickler v. Greene*, 527 U.S. 263, 281 (1999) ("[T]here is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict."); *United States v. Rutgerson*, 822 F.3d 1223, 1240-41 (11th Cir. 2016) (finding no prejudice from exclusion of evidence that defendant had not previously sought to have sex with a

28

child because it "would not have overcome the powerful evidence that he was, in fact, predisposed to commit the crime with which he was charged"). Crawford was not deficient for not asserting a *Brady* claim.

There also is not a probability, much less a reasonable one, that the jury would have acquitted Movant if it had seen his step-daughter's one-page letter dated June 5, 2014. Movant's step-daughter said in that letter that she had known Movant for six years, she had been alone with him many times, and he never made any advances at her or her teenage friends. (Doc. 67-1 at 199.) The letter constituted inadmissible hearsay because, according to Movant, it would have been admitted for the truth of his step-daughter's statements about her interactions with Movant.

Movant's step-daughter also said in the letter that she understood that Movant "has been charged with child pornography." (*Id.*) Movant was not charged with any crime related to child pornography. The letter thus would have prejudiced Movant in that regard, if it would have even been admissible given that statement. In short, it was reasonable for Crawford not to present the letter, and there is not a reasonable probability that the jury would have acquitted Movant if it had seen the letter.

Movant's step-daughter could have testified at trial, but Movant has not presented any evidence that she sought to testify or would have testified. Movant did

AO 72A
(Rev. 8/82)

not identify any of the other purported character witnesses, much less present any evidence that anyone else would have testified on his behalf or that Crawford knew of any potential witnesses. "Defense counsel's failure to call certain witnesses is not sufficient grounds for a Sixth Amendment claim," particularly where, as here, there is no evidence that purported witnesses' testimony would have mitigated the abundant evidence of guilt. *See United States v. Hughes*, 635 F.2d 449, 453 (5th Cir. 1981). "Which witnesses, if any, to call, and when to call them, is the epitome of a strategic decision, and it is one that [courts] will seldom, if ever, second guess." *Waters v. Thomas*, 46 F.3d 1506, 1512 (11th Cir. 1995); *see United States v. Long*, 674 F.2d 848, 855 (11th Cir. 1982) ("This Court will not second-guess tactical decisions of counsel in deciding whether to call certain witnesses.").

Movant's claims regarding exculpatory evidence are little more than an argument that because Movant had not committed any crimes before March 1, 2014, and there is no evidence that he engaged in any wrongdoing before that date, a jury could not reasonably believe that he committed the crime for which he was convicted. As explained above, the absence of criminal activity or incriminating evidence before the crime at issue is not evidence the government must disclose under *Brady*.

30

If Movant's theory were true, every one would get a free pass for their first crime. The same is true of Movant's claim that he should not have been convicted because there was no evidence that he ever did anything improper with a child despite interacting with children his entire adult life. If that was the law, a bank robber with no criminal history who had visited numerous banks (including the one he robbed) on hundreds of occasions before the robbery without ever doing anything wrong could avoid responsibility for his crime. As one court aptly put it:

> The principle is rather elementary. A defendant charged with robbing a bank in Manhattan on April 22 cannot offer as evidence to disprove the charged crime that he did not rob the bank's branches in Brooklyn or the Bronx on April 22 or that he did not rob the Manhattan branch on April 20, 21, 23, and 24, because this evidence is irrelevant to the charge that he robbed the Manhattan bank on April 22.

*United States v. Fiumano*, No. S3 14 Cr. 518 (JFK), 2016 WL 1629356, at *7 (S.D.N.Y. Apr. 25, 2016). Movant's claims regarding exculpatory evidence border on the frivolous and fall far short of establishing ineffective assistance of counsel.

D.    Claims Regarding The ICAC Standards

Movant claims that the ICAC Standards Crawford was unable to authenticate at trial were admissible under the Federal Rules of Evidence and should have been admitted. (Doc. 67-1 at 29-30.) As noted above, the court of appeals rejected the

31

claim that the Court improperly excluded the document, and Movant cannot relitigate that claim.

Movant also claims that Nicholson and Lindsey falsely testified at trial that they did not recognize the ICAC Standards Crawford showed them. (*Id.* at 23-27.) The only basis for that claim is that the ICAC Standards had existed since at least 2009, so the witnesses should have known them. (*Id.*) But the witnesses admitted they were trained on the ICAC Standards and were generally aware of them. (Doc. 60 at 111-13, 124-25, 133-34, 145-48.) Their inability to say that they had seen the particular document Crawford showed them does not establish that they were lying. Crawford thus cannot be faulted for not challenging the witnesses' testimony as perjured.

Movant further claims that Respondent improperly failed to produce the ICAC Standards and Crawford improperly failed to call Task Force Coordinator Cynthia Fuller to testify about them. (Doc. 67-1 at 62-68, 84-85.) Underlying all those claims are Movant's assertions that he did not qualify as a target of the sting operation under the ICAC Standards and its list of investigative priorities and, thus, evidence about the ICAC Standards would have demonstrated his innocence. (*Id.* at 9, 86-87, 99-101.)

Having reviewed the ICAC Standards Crawford offered as evidence at trial, the Court disagrees with Movant's characterization of the standards as evidence that

would have supported his innocence.  Even if Movant was not a high priority target under the ICAC Standards given his lack of prior child sex crimes, there was clear evidence of his crime in this case.  Respondent was entitled to prosecute him for that crime without regard to the ICAC Standards.

Crawford elicited testimony from Respondent's witnesses suggesting that Nicholson did not adhere to the ICAC Standards in her communications with Movant and that her Craig's List ad violated Craig's List's policies.  (Doc. 60 at 113-15, 147-48.)  It is not probable that, despite having that evidence and the damning evidence of Movant's communications and acts, the jury would have acquitted Movant if it also had seen the ICAC Standards or received additional testimony about those standards. Movant has not shown that Crawford rendered ineffective assistance in any manner in connection with the ICAC Standards or the trial witnesses' testimony about them.

E.   Claims Of Prosecutorial Misconduct

Movant contends that Respondent's counsel engaged in misconduct at trial by presenting perjured testimony, making improper remarks in opening statements and closing arguments, and by "suppress[ing] volumes of exculpatory evidence." (Doc. 67-1 at 54-60, 69-73, 97-98.)  The Court has addressed Movant's claims that Respondent suppressed exculpatory evidence and that Nicholson and Lindsey lied

33

about not recognizing the ICAC Standards.  *Supra* Parts III.C-D.  For the reasons

discussed above, Movant has not shown that Crawford was ineffective for not raising

those claims.

Movant contends that Drew lied at trial about his interview with Movant

following Movant's arrest and that Respondent repeated the lie in its appellate brief

to the court of appeals.  (Doc. 67-1 at 57-58.)  Here is Drew's testimony at issue:

Q.     Did [Movant] say anything about having seen a Craig's List ad?

A.     He did. He said he saw a Craig's List ad on I believe casual
encounters, that he responded to that ad and had an exchange back and
forth with the person on that ad, and that was what prompted him to
come to where we were located in Lithonia.

Q.     All right. Did he remember in corresponding with the person who
put up the ad what they wanted?

A.     It's my understanding he was coming to meet a 14-year-old child
is what the ad was about.

Q.     Right. Did he tell you that?

A.     He didn't.

(Doc. 60 at 154-55.)

Movant stresses that he never told Drew he was going to meet a child, yet

Respondent's counsel stated in his appellate brief that Movant had said that.  (*See*

34

Doc. 67-1 at 125 (stating in appellate brief that "[i]n his post-arrest interview, McGill said he drove there to meet a 14-year-old girl" with citation to the portion of the trial transcript quoted above).) Movant has not shown that Drew lied. Drew simply testified that it was his understanding that the Craig's List ad concerned a teenager (it did) and that Movant was coming to the house in response to that ad. There was no basis for Crawford to object to Drew's testimony as perjury.

More importantly, Movant has not shown that Drew's statement or the statement in Respondent's appellate brief prejudiced him. Drew told the jury that Movant did not say that he went to the house to meet a child, Movant said "multiple times" that he did not think a child would be at the house, and Movant repeatedly said that he never intended to have sex with anyone at the house. (Doc. 60 at 155, 157, 160.) And as Movant admits in his § 2255 motion, the jury saw the relevant portions of the video recording of his interview with Drew. (Doc. 61 at 5-16; Doc. 67-1 at 57-58.) The jury also heard Movant testify unequivocally that he did not think a child would actually be at the house, he never intended to have sex with a child, and that he told Drew those things "numerous times." (Doc. 61 at 24-33, 43-44.) Movant has not shown prejudice.

As for the appeal, the court of appeals had the entire case record, including the trial transcript with all the testimony discussed above and the video recording of Movant's interview with Drew.  The misstatement in Respondent's brief was immediately followed by a citation to the page of the trial transcript containing the referenced testimony.  Given the damning evidence of Movant's guilt, and the court of appeals' discussion of that evidence in its opinion, it is frivolous to suggest that the single misstatement of testimony in Respondent's appellate brief impacted the court of appeals' decision.

Movant's complaints about statements Respondent's counsel made during his opening statement and closing argument are also frivolous.  Respondent's counsel did not say anything inflammatory or improper.  Respondent's counsel accurately described the evidence and, in closing, made proper arguments about the evidence. Those arguments were harsh and unfavorable to Movant, but that was because the evidence was harsh and unfavorable to him.  Moreover, the Court told the jury before opening statements, again before closing arguments, and again before deliberations that the lawyers' statements and arguments were not evidence. (Doc. 60 at 50, 63; Doc. 61 at 60-61, 92.)  Crawford was not ineffective for not objecting to the prosecutor's opening statements or closing arguments.

36

F.    The Entrapment Claim

Movant's claim that Respondent entrapped him in this case is perhaps his most incredible, and weakest, claim given the evidence presented at trial. As evidence of entrapment, Movant presents Nicholson's statement to the grand jury about another person and her testimony at trial that the Craig's List ad she posted violated Craig's List's policies. (Doc. 67-1 at 73-82, 93-96.) As discussed above, Nicholson's grand jury testimony did not show that Movant was entrapped in this case or provide any basis for an entrapment defense. *Supra* note 4.

Because Movant did not raise an entrapment defense, the issue is not whether the evidence proved entrapment, but whether Crawford was constitutionally ineffective for not raising the defense. Movant has not shown ineffective assistance.

"Entrapment is an affirmative defense that requires (1) government inducement of the crime, and (2) lack of predisposition on the part of the defendant to commit the crime before the inducement." *Rutgerson*, 822 F.3d at 1234. "[E]ntrapment is generally a jury question" because "[p]redisposition is a fact-intensive and subjective inquiry, requiring the jury to consider the defendant's readiness and willingness to engage in the charged crime absent any contact with the government's agents." *Id.* at 1234-35.

37

Movant's emails and text messages with Nicholson in response to the Craig's List ad were damning evidence precluding a viable entrapment defense. In his § 2255 motion, Movant focuses on the emails, which were few in number, and conveniently ignores the almost two hundred text messages that followed those emails. The emails, alone, show Movant's predisposition to meet the child with the intent to have sex with her. The text messages confirm that predisposition.

It is important to remember that, as Movant told Nicholson and testified about at trial, he was "well educated" with "4 degrees" (including a doctorate of philosophy) and decades of professional experience in the education field. In other words, the jury learned that Movant was not a naive spring chicken; given his intelligence, age, and extensive background in education, the jury could only reasonably conclude that Movant was capable of clearly communicating with Nicholson and understanding the import of those communications. Moreover, the jury observed Movant when he testified at trial and in the video recording of his post-arrest interview. *See Rutgerson*, 822 F.3d at 1235 ("[T]he fact-intensive nature of the entrapment defense often makes jury consideration of demeanor and credibility evidence a pivotal factor." (quoting *United States v. Brown*, 43 F.3d 618, 625 (11th Cir. 1995)).

38

Movant responded to the Craig's List ad by stating that he found the ad interesting and asking Nicholson what she was seeking. *Supra* Part I. Nicholson's reply was simple and to the point: "Looking for someone to teach my daughter how to be with a man." (Gov't Trial Ex. 3 at 1.) That statement, which indicates that Nicholson was not looking for someone for herself, did not give Movant pause. Seven minutes after Nicholson sent that message, Movant responded that he could help, wanted to know where she lived, and looked forward to further communications. (*Id.*)

In his next email, Movant asked Nicholson for her daughter's age. (*Id.*) Nicholson replied that her daughter was thirteen. (*Id.* at 2.) At that point, in the span of just six email messages between the two, Nicholson had told Movant – in response to him asking for this specific information – that she was looking for someone to teach her thirteen-year-old daughter how to be with an adult man.

But the reveal of the young girl's age did not give Movant pause either. Five minutes after Nicholson revealed the child's age, Movant replied "ok" and asked how the child felt "about all this." (*Id.*) Movant and Nicholson then switched to text messaging, where Movant further demonstrated his desire to meet the child and have sex with her.

39

It was Movant, not Nicholson, who first mentioned "sex." (Gov't Trial Ex. 4 at 1.) It was Movant who first mentioned a specific type of sex – "foreplay" – and asked if Nicholson had discussed "foreplay etc" with the child. (*Id.*) It was Movant who first mentioned a specific intimate act – a "kiss" – and asked if the child would freak out if he kissed her. (*Id.* at 2.) It was Movant who first mentioned a specific sexual act – "oral sex" – and wondered if the child would like it. (*Id.* at 5.) It was Movant who first mentioned what the child should wear when he met her – "sexy panties" – and discussed "kiss[ing] her on top of her bra and panties to start with" before undressing her while kissing and rubbing her body. (*Id.* at 4-5.) It was Movant who first mentioned masturbation and asked if the child had ever masturbated. (*Id.* at 5.) It was Movant who first mentioned sexual aids, by asking if Nicholson had "lube." (*Id.* at 6.) And it was Movant who directed that the child "shower everywhere because we may go there." (*Id.*) Movant never wavered or equivocated in his communications about having sex with the child. When he testified at trial, Movant acknowledged all his communications with Nicholson and did not deny any of them.

In light of those damning statements from a highly educated, intelligent, fifty-six year-old man, no reasonable juror could have concluded that Movant was not predisposed to commit the crime with which he was charged or that Respondent

40

induced him to commit that crime. "The long and short of it is that the government agents simply provided [Movant] with the opportunity to commit a crime by posting the [Craig's List] ad[], and his ready commission of the criminal act amply demonstrate[d] [his] predisposition." *See Rutgerson*, 822 F.3d at 1236; *see also United States v. Simmons*, 557 F. App'x 833, 835-36 (11th Cir. 2014) (same holding in similar case).

No reasonable lawyer would have presented an entrapment defense given the overwhelming evidence against Movant that consisted primarily of Movant's own words and deeds. And it is not probable, much less reasonably probable, that the jury would have acquitted Movant if Crawford had asserted the defense.

G.      The Supervised Release Claim

Movant complains that the Court sentenced him to supervised release for life following his imprisonment and did not state in the judgment a reason for doing so. (Doc. 67-1 at 104-05.) Movant was required to raise that claim on direct appeal, but did not. *See supra* Parts I-II. Movant has not shown cause and prejudice for that failure, as he did not even assert – much less show – that Shein rendered ineffective assistance on appeal. The claim challenging the length of his supervised release is thus defaulted.

41

Even if the claim was not defaulted, Movant has not shown error. At the sentencing hearing, the Court discussed at length the sentence it imposed and the reasons for that sentence. (Doc. 62 at 20-25.) The Court noted that although the statutory minimum sentence is sometimes too harsh, "[i]n this case it's not." (*Id.* at 20.) The Court then discussed the sentencing factors set out in 18 U.S.C. § 3553 and concluded, "based upon what I know about this case, what I know about you, and having considered all these factors under 3553," that supervised release for life was proper and that the entire sentence was reasonable. (*Id.* at 20-23.) The record reflects that the Court properly considered all the facts and relevant law before deciding to impose supervised release for life.

H.    The Other Claims Of Crawford's Alleged Ineffectiveness

The Court discussed most of the alleged instances of Crawford's ineffectiveness above in deciding whether the alleged ineffectiveness excused the procedural default of Movant's other claims. The Court addresses the remaining instances here.

Movant first contends that Crawford failed to adequately consult with Movant and prepare him to testify. (Doc. 67-1 at 3, 11.) Movant did not provide any details in support of that claim. Movant thus has not shown that Crawford was deficient or that Movant suffered prejudice as a result of allegedly inadequate preparation.

42

Movant contends that Crawford should have consulted and retained expert witnesses on pedophilia, "the modus operandi of a true pedophile," and Movant's psychiatric condition. (*Id.* at 3-6, 8, 9-10.) Movant contends that such witnesses could have testified about the typical profile of a pedophile and that Movant did not fit that profile. (*Id.*)

As discussed above, "[w]hich witnesses, if any, to call, and when to call them, is the epitome of a strategic decision, and it is one that [courts] will seldom, if ever, second guess." *Waters*, 46 F.3d at 1512 ; *see Hughes*, 635 F.2d at 453 ("Defense counsel's failure to call certain witnesses is not sufficient grounds for a Sixth Amendment claim . . . ." ). Moreover, "the duty to investigate does not force defense lawyers to scour the globe on the off chance something will turn up." *See Rompilla v. Beard*, 545 U.S. 374, 383 (2005).

Even if Crawford had presented an expert witness on pedophilia and expert testimony that Movant was not a pedophile, there is not a reasonable probability that such evidence would have changed the jury's verdict. Movant was not charged with being a pedophile or having a history of pedophilia, and there was not any evidence that Movant had any such history. Movant was charged with a specific unlawful act

43

that occurred on a specific occasion, and the evidence was more than sufficient to support his guilt as to that crime.

Not only was no evidence of other crimes or similar wrongdoing presented at trial, there was evidence that Movant had never, before March 1, 2014, engaged in any wrongdoing with or concerning a child. That evidence came from Drew's interview with Movant and Movant's testimony and was undisputed, as was the evidence that Movant had been a school teacher or school administrator for thirty-five years. Because all of that evidence was favorable to Movant and the evidence of his guilt was overwhelming, Crawford was not ineffective for not consulting expert witnesses or presenting such witnesses at trial.

Movant next contends that Crawford failed to "investigate the compelling arguments against the application of . . . § 2422(b) and which elements of violation of this statute is actually criminalized by Congress." (Doc. 67-1 at 7-8, 12-13.) Movant argues here, as he did in many other claims, that he never attempted to persuade, induce, entice, or coerce the fictitious child to engage in sexual conduct and that the emails do not support a contrary finding. (*Id.* at 12-13.) But as discussed above, the emails were neither the only nor the most damning evidence. Movant

44

argues that Crawford should have seen the lack of proof that he attempted to entice a child and moved for a judgment of acquittal at trial. (*Id.* at 11-13.)

At the close of Respondent's case at trial, Crawford told the Court: "Judge, I don't want to make any motions at this time. I think there is enough to get to the jury; [Respondent has] passed that threshold for directed verdict." (Doc. 61 at 18.) In rejecting Movant's claim that the trial evidence was insufficient to support his conviction, the court of appeals noted Crawford's decision not to move for a judgment of acquittal. (Doc. 65 at 6-8 & n.2.) The court of appeals concluded, however, that such a motion would have been futile because "the trial evidence amply supported all the elements of a § 2422(b) offense under the attempt clause" and that Movant thus "sustained no prejudice from his trial counsel's failure to move for a judgment of acquittal." (*Id.* at 8 n.2.)

Upon independent review of the evidence presented at trial, the Court agrees that there was no basis for Crawford to move for judgment of acquittal and that the Court would have denied such a motion given the overwhelming evidence of Movant's guilt. Crawford presented the best defense he could given the evidence, but the jury had to decide what to believe. *See United States v. Albanes-Gomez*, 396 F. App'x 644, 645 (11th Cir. 2010) ("A jury is entitled to believe as much or as little of

45

the witnesses' testimony as it finds credible . . . ."); *United States v. Jiminez*, 564 F.3d 1280, 1285 (11th Cir. 2009) ("[W]e assume that the jury made all credibility choices in support of the verdict."). There is no basis to find that Crawford misunderstood the elements of the § 2422(b) offense or failed to challenge those elements at trial.

Movant also contends that Crawford should have objected to the "conflicting directions" the Court gave in its jury instructions. (Doc. 67-1 at 10, 88-89, 102-04.) Movant contends that the Court's instructions regarding § 2422(b) and its elements contravened Eleventh Circuit precedent because the instructions told the jury that Respondent did not have to prove that the child was actually induced or enticed to engage in sexual activity. (*Id.*) Movant is wrong.

Movant contends the jury instructions regarding § 2422(b) were like the erroneous instructions in *United States v. Joseph*, 542 F.3d 13 (2d Cir. 2008), *abrogation recognized by United States v. Ferguson*, 676 F.3d 260 (2d Cir. 2011). *Joseph* is no longer good law, but even if it was, the error in the instructions in that case was not present in Movant's case.

In *Joseph*, the trial court erred by instructing the jury that it could find guilt under § 2422(b) if the defendant either attempted to persuade the child to engage in a sexual act or made the possibility of a sexual act with the defendant more appealing.

46

*Joseph*, 542 F.3d at 17.  The latter option – making the possibility more appealing to the child – was the error because it "does not reflect the requirement of an intent to entice" and "permitted conviction even if Joseph did *not* intend to entice [the child] into engaging in a sexual act with him." *Id.* at 18.

The Court's instructions to the jury in this case did not contain any such alternative basis for conviction.  The instructions were clear that Respondent had to prove that Movant intended to persuade, induce, or entice what he believed to be a child to engage in sexual activity. (Doc. 61 at 97-101.)  The Court correctly instructed the jury that it was not necessary for Respondent to prove that the child was "actually persuaded, induced or enticed" because Movant was charged only with attempt. (*Id.* at 99-101.)  The Court then instructed the jury that Respondent must prove Movant's intent to engage in the wrongful activity "in an attempt to stimulate or cause the minor to engage in unlawful sexual activity with him" and explained the elements of an attempt offense. (*Id.*)  The Court's instructions complied with Eleventh Circuit law regarding the elements of a § 2422(b) attempt offense and did not contain the flaw present in the instruction in *Joseph*.  *See United States v. Murrell*, 368 F.3d 1283, 1287-88 (11th Cir. 2004) ("Because we find that Murrell acted with the intent to

47

induce a minor to engage in unlawful sexual activity, the first element of attempt is satisfied.")  Crawford thus had no basis to object to the jury instructions.

The final alleged instance of ineffectiveness is that Crawford "was unprepared to adequately present defense using visual presentation to the jury" because when he cross-examined Nicholson he had to borrow Respondent's counsel's laptop that showed the email and text messages. (Doc. 67-1 at 11.) According to Movant, "[t]his could be assumed to prejudice [him] in the eyes of the jury as it appeared that defense counsel was unprepared." (*Id.*)  Movant's assumption falls far short of showing deficient performance or prejudice.  It was not ineffective assistance for Crawford to briefly use the prosecution's laptop while questioning one of Respondent's witnesses. Movant's argument to the contrary is frivolous.

The U.S. Supreme Court has repeatedly emphasized that criminal defense counsel "should be 'strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'" *Burt v. Titlow*, 134 S. Ct. 10, 17 (2013).  The Supreme Court has reminded courts to faithfully apply the "'strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance.'" *Id.*  That is because "the *Strickland* test 'has nothing to do with what the best lawyers would have done. Nor is the test even

48

what most good lawyers would have done. We ask only whether some reasonable lawyer could have acted, in the circumstances, as defense counsel acted at trial.'" *Bates v. Sec'y, Fla. Dep't of Corr.*, 768 F.3d 1278, 1299 (11th Cir. 2014) (quoting *Waters*, 46 F.3d at 1512).

Movant has not overcome that strong presumption with regard to Crawford's representation. None of his claims of ineffective assistance of counsel has merit.

## IV.   Certificate Of Appealability ("COA")

A federal prisoner may not appeal the denial of his § 2255 motion "unless a circuit justice or a circuit or district judge issues a certificate of appealability under 28 U.S.C. § 2253(c)." Fed. R. App. P. 22(b)(1). Rule 11 of the Rules Governing § 2255 Cases provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."

A COA may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). A substantial showing of the denial of a constitutional right "includes showing that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000) (citations and

49

quotation marks omitted). "When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim," a COA should issue "only when the prisoner shows both that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right *and* that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Jimenez v. Quarterman*, 555 U.S. 113, 118 n.3 (2009) (quotation marks omitted).

A COA is not warranted here because it is not reasonably debatable that Movant is not entitled to relief on his claims. Most of Movant's claims are procedurally defaulted. Movant has not shown that the default resulted from ineffective assistance of counsel or that Crawford rendered ineffective assistance on any issue, much less made a substantial showing of ineffective assistance.

## V. Conclusion

For the foregoing reasons, **IT IS RECOMMENDED** that Movant's motion to vacate sentence under 28 U.S.C. § 2255 [67] and a certificate of appealability be

AO 72A
(Rev.8/82)

**DENIED** and that case number 1:17-cv-805-WSD-LTW be **DISMISSED**. Movant's

petition to supplement the § 2255 motion [69] is **GRANTED NUNC PRO TUNC**.

**SO ORDERED & RECOMMENDED** this 20 day of March , 2018.

LINDA T. WALKER
UNITED STATES MAGISTRATE JUDGE

AO 72A
(Rev.8/82)